IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ALBERTO N., ET AL. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:99CV459 |
| | § | |
| ALBERT HAWKINS, ET AL., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' MOTION FOR ENFORCEMENT OF THIS COURT'S ORDERS
DATED JUNE 23, 2005, AND FEBRUARY 22, 2008**

Pursuant to Rule 70 of the Federal Rules of Civil Procedure, Plaintiffs, including

organizational Plaintiff TASH,[1] respectfully file this motion to enforce the Court's Orders dated

June 23, 2005, and February 22, 2008, in which the Court approved, adopted, and incorporated

the Second Partial Settlement Agreement and the Modified Second Partial Settlement Agreement

into its Orders.  In support, Plaintiffs would show:

Courts have the inherent power to enforce compliance with their lawful orders through

civil contempt.  *Spallone v. United States*, 493 U.S. 265, 276 (1990), *quoting Shillitani v. United

States*, 384 U.S. 364, 370 (1966); *see also Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d

311, 317 (3rd Cir.) (court has jurisdiction to enforce agreement incorporated into court order),

*cert. denied*, 498 U.S. 850 (1990).  Court orders, by their very nature, are enforceable and invest

the court with equitable authority to ensure compliance with their terms.  *Swann v. Charlotte-

Meckenberg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Green County Sch. Bd.*, 391 U.S. 430, 439

(1968).  Traditionally, courts have broad remedial powers in the event of noncompliance with

---

[1] Pursuant to ¶ 14.2 of the Agreements, the Parties agreed that Plaintiffs "would amend the Complaint to add TASH, an organizational Plaintiff, *for purposes of enforcing the Agreement*."  (Emphasis added.)

their orders. *Milliken v. Bradley*, 433 U.S. 267 (1977).  Federal law incorporated this power to enforce orders against recalcitrant parties into Federal Rule of Civil Procedure 70.

Further, a party's efforts, intentions, and rationales for ineffective actions are not relevant to compliance, *Palmigiano v. DiPrete*, 700 F.Supp. 1180, 1194 (D.R.I. 1988) (efforts not relevant to the determination of compliance), and it is settled law that good faith is no defense to contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 190-91 (1949).

Because, as will be established below, Defendants have failed or refused to comply with the orders of this Court, the must be found in contempt.

## I. PROCEDURAL HISTORY

On August 9, 1999, Plaintiffs Alberto N. and seven other Medicaid beneficiaries under the age of 21 filed suit against Defendants, officials with the Texas Medicaid program, alleging that Defendants ("Texas Medicaid") systemically deprived Plaintiffs and similarly situated beneficiaries of their entitlement to all medically necessary in-home health services (e.g., nursing services, personal care (attendant) services, therapy services, and durable medical equipment and supplies), in violation of the Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") provision of Title XIX of the Social Security Act, 42 USC §1396 *et seq.* ("Medicaid Act"). Because children were forced to seek institutional placement to receive all of their medically necessary services, it was further alleged that Texas Medicaid was in violation of the Americans with Disabilities Act's integration mandate, 42 USC § 12131 *et seq.;* 28 CFR § 35.130(d).  The lawsuit also alleged that Texas Medicaid was depriving these children of their entitlement to all medically necessary services without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

Prior to trial, this Court ordered the Parties to mediation, which ultimately produced three separate Settlement Agreements.  Each Settlement Agreement was approved, adopted, and fully incorporated into an Order of this Court. (See Exhibits B & C)  Pursuant to the terms of the Second and Modified Second Agreements, this Court "retains exclusive jurisdiction over all matters relating to the enforcement of the Agreement[s] . . . ."  (See Exhibit A, Second Partial Settlement Agreement ("Second Agreement") and Exhibit C, Modified Second Partial Settlement Agreement[2] ("Modified Agreement"), ¶ 16.1 (referred to collectively as "Agreements")).

## II. ACTIONS BY THE DEFENDANTS REQUIRED BY THE COURT'S ORDERS

### A.    Conform Texas Medicaid's Rules to the Terms of the Agreements

This Court ordered Texas Medicaid to conform its rules, which are contained in the Texas Administrative Code, to the terms and conditions of the Agreements.  Specifically, the Court ordered that,

> The Agency agrees to propose, amend, withdraw, or repeal agency rules so that agency rules conform to the terms and conditions of this Agreement.  The Agency will initiate the rulemaking process within forty-five (45) days of any action required by this Agreement that necessitates a rule to be promulgated, amended, withdrawn, or repealed.

Agreements, ¶ 12.1.

Despite this Court's Orders, Texas Medicaid has failed and refused to bring its Texas Administrative rules into conformity with the terms of the Agreements.

---

[2] The Modified Second Partial Settlement Agreement contained all of the provisions of the Second Partial Settlement Agreement, with the addition of ¶ 4.3.5.

**B.      Conform Texas Medicaid's Medical Benefit Policies to the Terms of the Agreements**

Texas Medicaid was also ordered by this Court to conform its medical benefit policies, which are contained in its Texas Medicaid Policies and Procedures Manual ("TMPPM"), to the terms and conditions of the Agreements.  Specifically, Texas Medicaid was ordered:

> Starting with the effective date of this Agreement [June 23, 2005] and prior to the publication of the 2007 *Texas Medicaid Provider Procedures Manual*, the Agency will review all medical benefit policies for Private Duty Nursing services and Home Health Skilled Nursing services to identify changes necessary to conform the policies to the terms and conditions of this Agreement. . . .  All changes to nursing services policies necessary to conform to the terms and conditions of this Agreement will be included in the 2007 *Texas Medicaid Provider Procedures Manual*.

Agreements, ¶ 8.4.

Despite the Court's Order, Texas Medicaid has failed and refused to bring all of its medical benefit policies into conformity with the Agreements.

## III. SPECIFIC RULES AND POLICIES THAT FAIL TO COMPLY WITH THE TERMS OF THE AGREEMENTS

**A.      Private Duty Nursing Rules and Policies**

Texas Medicaid has failed to propose, amend, withdraw, or repeal its Texas Administrative Code rules governing the Private Duty Nursing services benefit ("PDN") so as to bring them into conformity with the terms of the Agreements.  Pursuant to the Court's Order, Texas Medicaid was to have initiated the rulemaking process within forty-five (45) days of any action required by the Agreements that necessitated a rule to be promulgated, amended, withdrawn, or repealed. Agreements, ¶ 12.1.  To date, Texas Medicaid has failed to bring its

PDN rules, found at 1 TAC Chapter 363,[3] into conformity with the Agreements and as such, those rules remain largely identical to the rules that existed at the time Plaintiffs filed their lawsuit alleging that Texas Medicaid's operation of the PDN benefit failed to comply with the requirements of the Medicaid Act.  Texas Medicaid was also to have changed its PDN medical benefit policies prior to the publication of the 2007 TMPPM.  The rules now conflict with the TMPPM policies that have been amended.  Additionally, some of the TMPPM policies also continue to fail to comport with the terms of the Agreements (see Exhibit F).

### 1.    All Medically Necessary Services

#### a)    Medical Necessity Standard for Private Duty Nursing Services

The EPSDT provision of the Medicaid Act and the Agreements require Texas Medicaid to provide beneficiaries under the age of 21 with all medically necessary Private Duty Nursing services.[4] 42 USC §1396d(r)(5); Agreements, ¶ 2.2.  "EPSDT is a comprehensive child health program designed to assure the availability and accessibility of health care resources for the treatment, correction and amelioration of the unhealthful conditions of individual Medicaid recipient under the age of 21."  *S.D. v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004).  The Medicaid Act mandates that States adhere to the EPSDT medical necessity standard set out in the statute: States are required to provide "such other necessary health care, diagnostic services, treatment, . . . to correct or ameliorate defects and physical and mental illnesses and

---

[3] The Texas Administrative Code, attached as Exhibit D, states that Title I, Part 15, Chapter 363, Subchapter C establishes rules for private duty nursing services as a benefit in the Early and Periodic Screening, Diagnosis and Treatment Comprehensive Care Program (EPSDT-CCP).  1 TAC §363.301.  When a Medicaid beneficiary is denied PDN and requests a fair hearing to challenge the denial, Texas Medicaid sends a copy of the rules to the beneficiary as part of the documents that formed the basis for the decision and that Texas Medicaid intends to use at the hearing. Because the rules do not comport with the Agreements and are now largely inconsistent with the TMPPM, beneficiaries cannot discern how the rules support Texas Medicaid's decision, leaving them at a disadvantage in preparing for hearing.

[4] For a description and examples of children and their conditions that require nursing services, see the Report and Recommendation of the United States Magistrate Judge, signed June 8, 2008.

conditions . . ." 42 USC §1396d(r)(5).  *See S.D.*, 391 F.3d at 592 ("Equally plain is the criterion

for the application of these means: the heath care requested must be necessary to 'correct' or

'ameliorate' an eligible EPSDT child's defect, illness or condition.")   Pursuant to this statutory

requirement, the Parties agreed to the following medical necessity standard for PDN:   PDN

services are medically necessary when "the requested services correct or ameliorate the

Beneficiary's disability or physical or mental illness or condition." 42 USC §1396d(r)(5);

Agreements, ¶ 4.1. The Agreements further clarify that "[n]ursing services correct or ameliorate

the Beneficiary's disability or physical or mental illness or condition when the services improve,

maintain, or slow the deterioration of the Beneficiary's health status." Agreements, ¶ 4.2.  The

broad scope of the "correct or ameliorate" medical necessity standard reflects Congress's

intention that EPSDT services be provided affirmatively and aggressively. *Mitchell v. Johnson*,

701 F.2d 340, at 347-348 (5th Cir. 1983)(citing *Stanton v. Bond*, 504 F.2d. 1246, 1250 (7th Cir.

1974)). *See also,* Introduction to the Final Regulation Guidelines for the EPSDT Program, issued

June 28, 1972 as part of the Medical Assistance Manual, Part 5, Sections 5-70-00 *et seq.*

(through the EPSDT program "Congress intended to require states to take aggressive steps to

screen, diagnose and treat children with health problems").

    The Agreements also require Texas Medicaid to "authorize all requested medically

necessary Private Duty Nursing services that are required to meet all of the Beneficiary's Private

Duty Nursing needs over the span of time the needs arise, as the needs occur over the course of a

24-hour day."  Agreements, ¶ 2.4.

    Despite the Court's Orders from 2005 and 2008, Texas Medicaid has taken no steps to

amend its rules to conform to this medical necessity standard for PDN services. Instead, Texas

Medicaid's  rules continue to describe the same medical necessity standard that was in place

when Plaintiffs filed their lawsuit in 1999.   The Texas Medicaid Medical Necessity rule states:

> Medical Necessity Criteria for Private Duty Nursing :
> a) Private duty nursing is considered medically necessary if a person requires continuous,
> skillful observation and judgment to maintain or improve health status; and
> (1) is dependent on technology to sustain life; or
>  (2) requires ongoing  and frequent skilled interventions to maintain or improve health
> status, and delayed skilled intervention is expected to result in:
> (A) deterioration of a chronic condition;
> (B) loss of function;
> (C) imminent risk to health status due to medical fragility; or
> (D) risk of death.
> (b) Determining medical necessity for private duty nursing includes assessment of the
> following elements:
> (1) complexity and intensity of the client's care;
> (2) stability and predictability of the client's condition; and
> (3) frequency of the client's need for skilled nursing care.

1 TAC § 363.309

The Texas Medicaid PDN Benefits and Limitation rule also does not comport with the

agreed upon "correct or ameliorate" medical necessity standard.  It states:

> Private Duty Nursing Benefits and Limitations
> (a)Private duty nursing benefits include the following services.
> …
> (2) Amount and duration.
> (A) The amount and duration of private duty nursing services requested will be evaluated
> based upon review of the following documentation:
> (i) frequency of skilled nursing interventions;
> (ii) complexity and intensity of the client's care;
> (iii) stability and predictability of the client's condition; and
> (iv) identified problems and goals.
> (B) The amount of private duty nursing should be re-evaluated when:
>  (i) one or more of the client's problems documented in the plan of care are resolved;
>  (ii) one or more of the goals documented in the plan of care are met;
>  (iii) there is a change in the frequency of skilled nursing interventions, or the complexity
> and intensity of the client's care;
> (iv) alternate resources for comparable care become available; or
>  (v) the primary care giver becomes able to meet more of the client's needs.

These rules conflict with the Agreements in the following ways:

- They fail to track the medical necessity language used in the Agreements and required by the Medicaid Act; i.e., "the requested services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition."

- The Medical Necessity rule requires the beneficiary to have a need for "continuous skillful observation," a requirement not found in the Agreements' medical necessity standard and contrary to the Agreements' requirement that Texas Medicaid authorize services "over the span of time the needs arise, as the needs occur over the course of a 24-hour day."

- The Medical Necessity rule requires the services to "maintain or improve health status" and fails to reference the Agreement's standard, which states that PDN services are also medically necessary when needed to "slow the deterioration of the Beneficiary's health status."

- The Medical Necessity rule requires the beneficiary to demonstrate that he or she "is dependent on technology to sustain life[5] or requires ongoing and frequent skilled interventions to maintain or improve health status, and delayed skilled intervention is expected to result in deterioration of a chronic condition; loss of function; imminent risk to health status due to medical fragility; or risk of death," none of which is included in the Agreements' medical necessity standard. Pursuant to the Agreements, beneficiaries are not required to be dependent on technology to sustain life, nor must they demonstrate that delayed intervention

---

[5] References to the "dependent on technology," "stability" and predictability  criteria are also found in the Texas Medicaid rule describing definitions for PDN. 1 TAC 363.306(6), and (18).  Texas Medicaid must withdraw these definitions in order to comply with the Agreements.

will result in deterioration of a chronic condition, loss of function, imminent risk to health status due to medical fragility, or risk of death.  These requirements impermissibly go well beyond the EPSDT "correct or ameliorate" standard agreed to by the Parties and specifically mandated by the Medicaid Act.

- The references to the "complexity," "intensity," "stability[1]," "predictability" and "frequency" of the beneficiary's need for PDN services found in both rules likewise circumvent the broad scope of the EPSDT "correct or ameliorate" standard.   The "correct or ameliorate" standard rejects the concept that beneficiaries must demonstrate a threshold level of complexity, intensity, and frequency of need or an absence of stability and predictability in order to demonstrate a medical need for services.  In addition to rejecting these excessive requirements by adopting the EPSDT medical necessity standard, the Parties also specifically rejected the view that a beneficiary with a "stable" condition does not have a medical need for PDN:

When a Beneficiary's medical needs have not decreased, as documented by the prior authorization request, the Agency and its Contractor will not deny or reduce the amount of nursing services on the basis that the Beneficiary's condition or health status is "stable" or has not changed.

Agreements, ¶ 4.3.

Texas Medicaid continues to impermissibly deny PDN services, citing the out of date PDN Texas Administrative Code rules. (See Exhibits H, I, J, K).

Additionally, while the TMPPM policies begin with the correct medical necessity standard, they then tack on some of the same problematic language found in the rules:

> PDN is considered medically necessary when a client has a disability, physical or mental illness, or chronic condition and requires continuous, skillful observations, judgments and interventions to correct or ameliorate his or her health status…. The following elements should always be addressed in documentation submitted for a request for PDN: is dependent on technology to sustain life; requires ongoing and frequent skillful interventions to maintain or improve health status, and the delayed skilled intervention is expected to result in any of the following conditions: deterioration of a chronic condition; risk of death; loss of function; imminent risk to health status due to medical fragility. TMPPM §43.4.13.4

This policy continues to be in effect Plaintiffs' counsel attended a Medicaid Fair Hearing in May, where the Texas Medicaid representative relied upon this erroneous medical necessity standard as well as the ones found in the TAC rules, to support Texas Medicaid's position.  The Hearing Officer has not ruled in that case; however, Plaintiffs' counsel can, if necessary, provide a recording of the testimony, under seal.

### *b)*      **Definition of Private Duty Nursing Services**

Federal regulations implementing the Medicaid Act include a specific definition for Private Duty Nursing.  It states:

> Private duty nursing services.
>
> Private duty nursing services means nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility.
> These services are provided—
> >  (a) By a registered nurse or a licensed practical nurse;
> >  (b) Under the direction of the recipient's physician; and
> >  (c) To a recipient in one or more of the following locations at the
> >  option of the State--
> >   (1) His or her own home;
> >   (2) A hospital;[6] or

---

[6] Texas Medicaid's PDN Place of Service rule does not include hospital or nursing facility as places where PDN can be provided, despite Texas Medicaid's obligation to provide all mandatory and optional services to EPSDT beneficiaries. 1 TAC  §363.317(a).

> (3) A skilled nursing facility.

42 CFR §440.80

The Agreements also include a specific definition for PDN:

> Private Duty Nursing services are nursing services, as described by the Texas Nursing Practice Act and its implementing regulations that are authorized when the Beneficiary requires more individual and continuous care than is available from Home Health Skilled Nursing services.  Private Duty Nursing services are available only through the EPSDT program.

Agreements ¶1.18

Texas Medicaid PDN rules include the following definition:

> (13) Private duty nursing--Skilled nursing reimbursed hourly for clients who meet the THSteps-CCP medical necessity criteria and who require individualized, continuous skilled care beyond the level of skilled nursing visits normally authorized under §§354.1031 - 354.1041 of this title (relating to Medicaid Home Health Services). Skilled nursing services are provided by a registered nurse, licensed vocational nurse, or as a delegated service provided by a qualified aide[7] through a licensed home and community support services agency, by a registered nurse enrolled as an independent provider, or by a licensed vocational nurse enrolled as an independent provider in the Texas Medicaid Program.

1 TAC § 363.303(13).

While this definition is similar to the agreed upon definition, it fails to comport with the Agreements due to the insertion of the word "skilled" before nursing services.  There is no such thing as "skilled" and "unskilled" nursing services, and the Parties were careful to make that clear by including a definition of "nursing services" in the Agreements:

> Nursing services as described by the Texas Nursing Practice Act and its implementing regulations, include observation, assessment, intervention, evaluation, rehabilitation, care and counsel, or health teachings of a Beneficiary who has a disability or chronic health condition or who is experiencing a change in normal health processes.  Nursing services also include the supervision of delegated nursing tasks.  Tex. Occ. Code § 301.002 (Vernon 2004).

---

[7] While not addressed in the Agreements, Plaintiffs note that the federal definition of PDN requires the services to be provided by "a registered nurse or a licensed practical nurse" and does not appear to allow the services to be provided by a non-nurse such as an aide.

Agreements, ¶ 1.13.  While this may seem a minor point, Texas Medicaid officials relied upon the artificial distinction of "skilled" and "unskilled" to deny PDN services to EPSDT beneficiaries whose needs actually met the Texas Nursing Practice Act definition of nursing services.  *See* Plaintiffs' Motion for Summary Judgment and Brief, dated August 25, 2000, p. 19. and the Appendix, section C(2(a)(ii).

The definition of PDN found in the Texas Medicaid PDN Benefits and Limitation rule also fails to comport with the Agreements.  It states:

> Private Duty Nursing Benefits and Limitations
> (a) Private duty nursing benefits include the following services.
> (1) Direct *skilled* nursing care and caregiver training and education intended to:
> (A) optimize client health status and outcomes; and
> (B) promote and support family-centered, community-based care as a component of an array of service options by:
> (i) preventing prolonged and/or frequent hospitalizations or institutionalization;
> (ii) providing cost-effective, quality care in the most appropriate environment; and
> (iii) providing training and education of caregivers.
> (2) Amount and duration.
> (A) The amount and duration of private duty nursing services requested will be evaluated based upon review of the following documentation:
>   (i)frequency of *skilled* nursing interventions;

(emphasis added) 1 TAC §363.311.  Again, the addition of the word "skilled" circumvents the Agreements.

The PDN rules also include a definition of "continuous" that does not conform to the Agreements.  It states: (4) Continuous--Ongoing throughout a 24-hour period.

1 TAC §363.303(4).  Beneficiaries are entitled to all medically necessary services, regardless of whether their needs occur throughout a 24 hour period.  The reference to 24 hour period in the Agreements requires Texas Medicaid to provide PDN over the course of 24 hours

as the beneficiary's needs arise; it does not require the beneficiary to demonstrate that his or her needs occur around the clock.  Agreements, ¶ 2.4.

These erroneous definitions operate to deny beneficiaries all medically necessary PDN. As demonstrated by the denial notices attached as Exhibits H, I, K and L, Texas Medicaid is denying services based on its interpretation of what is "skilled," to beneficiaries who require gastrostomy tube feedings, suctioning, chest percussive therapy, ostomy care, monitoring of apnea, administration of oxygen and monitoring of seizure activity, all of which meet the definition of nursing services set out in the Texas Nursing Practice Act.  Again, the Agreements make specific reference to the Texas Nursing Practice Act so as to avoid this type of subjective, uniformed review.  These notices also demonstrate that services are being incorrectly denied on the basis that they are not "continuous," as that phrase is inaccurately interpreted by Texas Medicaid.

### c) Requirement that Parents Provide Private Duty Nursing Services

Because Texas Medicaid must provide all medically necessary PDN, it cannot require parents or guardians to provide the PDN services themselves or to identify an "alternate caregiver" to provide the PDN services.  The Parties agreed[8] to the following:

> The Agency and its Contractor will not require a Beneficiary's parent or guardian to provide nursing services to the Beneficiary.  The Agency and the Contractor will not require a Beneficiary or a Beneficiary's parent or guardian to designate an alternate caregiver to provide nursing services. The Agency or its Contractor will not deny or reduce the amount of requested nursing services because the Beneficiary's parent or guardian is trained and capable of performing such services, but chooses not to do so. The Agency may require Providers to instruct and train parents and guardians so that they are able to perform nursing services should an emergency arise (e.g., the scheduled nurse is unexpectedly unavailable).  Parents and guardians may voluntarily choose to provide

---

[8] The Parties reached a settlement of this issue after Magistrate Love ruled in favor of Plaintiffs' Motion for Summary Judgment, which alleged that Defendants' policies and practice requiring parents to provide some or all of their child's medically necessary PDN violated the Medicaid Act.  See Report and Recommendation of the United States Magistrate Judge, signed June 8, 2007.

part of the Beneficiary's medically necessary nursing services themselves, and, should they so choose, they will receive the instruction and training necessary to do so.

Modified Second Partial Settlement Agreement, ¶ 4.3.5.

Despite settling this issue, Texas Medicaid has failed to withdraw its rules that require parents and guardians to either provide the PDN themselves or identify an "alternative caregiver" to provide the service.  Likewise, the Client Eligibility rule, which has not been amended since Plaintiffs filed their suit, states:

> Client Eligibility Criteria
> a) To be eligible for private duty nursing services, a client must:
>   …
>   (5) have an identified primary care giver residing in the client's residence and an identified alternate care giver who is or can be trained to provide part of the client's care, or if no alternate care giver is identified, a current plan to enable the client to receive care in an alternate setting or situation if the primary care giver is unable to fulfill his or her role.

1 TAC § 363.307(a)(5).

The Private Duty Nursing Benefits and Limitations rule states:

> Private Duty Nursing Benefits and Limitations
> (a) Private duty nursing benefits include the following services.
>   …
>   (2) Amount and duration.
>     …
>   (B) The amount of private duty nursing should be re-evaluated when:
>       …
>   (v) the primary care giver becomes able to meet more of the client's needs.
>
>   (b) Private duty nursing service limitations include the following:
> …
>   (2) Private duty nursing shall neither replace parents or guardians as the primary care giver nor provide all the care that a client requires to live at home. Primary care givers remain responsible for a portion of a client's daily care, and private duty nursing is intended to support the care of the client living at home.

1 TAC § 363.311(a)(2)(B)(v) and (b)(2).

Likewise, the PDN definitions include the following:

> (1) Alternate care giver--An individual identified by the primary care giver who agrees to be trained and to maintain the skills necessary to provide care competently for the client when the primary care giver is unable to do so. An alternate caregiver living with the client is not eligible for Medicaid (Title XIX) reimbursement for rendering care to the client.
> …
> (11) Primary care giver--An individual(s) who has agreed to accept the responsibility for a client's routine daily care and the provision of food, shelter, clothing, health care, education, nurturing, and supervision. Primary care givers may include but are not limited to parents, foster parents, guardians, or other family members by birth or marriage. A primary care giver provides daily, uncompensated care for the client, and participates in the development and implementation of the client's plan of care. The primary care giver or other person living with the client is not eligible for Medicaid (Title XIX) reimbursement for rendering care to the client.

> 1 TAC § 363.301(1) and (11).

Texas Medicaid must withdraw each of these rules in order comply with the Agreements.

### d)      24-Hour Private Duty Nursing

The Parties agreed that Texas Medicaid must provide PDN 24 hours per day  for those

rare beneficiaries who require PDN on an around the clock basis.  The Agreements state:

> The Agency will authorize all requested medically necessary Private Duty Nursing services that are required to meet all of the Beneficiary's Private Duty Nursing needs over the span of time the needs arise, as the needs occur over the course of a 24-hour day. 42 U.S.C. § 1396d(r)(5).

Agreements ¶ 2.4

> The Agency will not establish or apply a cap on the amount of medically necessary nursing or personal care services available to Beneficiaries.    42 U.S.C. §§ 1396a(a)(10)(B), 1396a(a)17, 1396d(r)(5); 42 C.F.R. § 440.230(c).

Agreements ¶ 2.8

Despite this agreement, Texas Medicaid has not withdrawn its rule, which limits the availability

of 24 hour PDN.  The rule states:

> Private Duty Nursing Services Benefits and Limitations
> (a) Private duty nursing benefits include the following services.
> …
> C) 24-hour private duty nursing will be authorized only:
> (i) for limited periods of time with defined end dates when medically necessary and appropriate based on the needs of the client;
> (ii) for limited periods of time with defined end dates related to the medical needs of the primary care giver, only when the alternate care giver is not available; and
> (iii) in the absence of both the primary care giver and the alternate caregiver, if another alternate person is designated who can legally make decisions on behalf of the client and who will reside in the client's home during the time 24-hour private duty nursing will be provided.

1 TAC §363.311.  Neither the Agreements nor the Medicaid Act allow Texas Medicaid to limit

the time periods over which beneficiaries may receive 24 hour PDN.  Additionally, as discussed

above, Texas Medicaid cannot require parents and guardians to provide the PDN services

themselves or identify an alternate caregiver to provide the services; therefore, making the

services only available when the parents or guardians have medical needs, or in their absence,

circumvents Texas Medicaid's obligation to provide all medically necessary PDN.  Texas

Medicaid must withdraw these rules in order to comply with the Agreements.

*e)*        **Process for Determining Authorizations of Private Duty Nursing**

The Parties agreed to a specific prior authorization process to be followed by Texas

Medicaid, and any contractor implementing the process, when reviewing requests for PDN.  The

specificity was meant to reduce the chance that erroneous decisions would be made and to make

public what had previously been a secret review process[9].  The Agreements describe the process

as follows:

---

[9] See Plaintiffs' Motion for Summary Judgment and Brief, p.17.

Prior Authorization Process for Nursing Services

4.4     The Agency will authorize nursing services, either through Home Health Skilled Nursing services or Private Duty Nursing services, based upon a plan of care, which includes the physician's orders and is supplemented by a service plan, a Title XIX form (if required), and any additional materials submitted by the Provider to support medical necessity for the requested service.  The plan of care is established and periodically reviewed by the treating physician in consultation with home health agency staff and the Beneficiary's Parent/Guardian.  The Agency and its Contractor may also consider any relevant records to which they are legally entitled.

42 C.F.R. § 484.18.

4.5     The Agency and its Contractor will utilize licensed nurses (Nurse Reviewers) to make prior authorization determinations for nursing services.  These nurses must act within their scope of practice as established by the Texas Board of Nurse Examiners.

4.6     When reviewing requests for nursing services, the Agency and its Contractor will apply the definitions of these services as set forth in paragraphs 1.7, 1.13, and 1.18 of this Agreement.

4.7     The Agency or its Contractor will review requests for nursing services to confirm that: (a) the Beneficiary's current diagnosis, functional status, and condition are clearly and consistently described throughout the documentation; (b) the treatment is described consistently throughout the documentation; and (c) an explanation has been provided as to how the requested nursing services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition.  If any of this information is missing, the Agency or its Contractor will follow the procedure for Incomplete Requests described in paragraph 20 of the Partial Settlement Agreement effective April 19, 2002.

4.8     For complete requests, the Agency or its Contractor will determine whether: (a) the requested services are nursing services as defined by the Texas Nursing Practice Act and its implementing regulations; (b) the Beneficiary's nursing needs could be met on a per-visit basis through Home Health Skilled Nursing services; and (c) the requested services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition.  When the Agency or its Contractor determine that the requested services are not nursing services, they will then determine whether the documentation may support a request for personal care services.

4.9     The Agency or its Contractor will authorize Private Duty Nursing services when: (a) the request is complete, as described in paragraph 4.7; (b) the requested services are nursing services as defined by the Texas Nursing Practice Act and its implementing regulations; (c) the explanation is sufficient to support that the requested services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition; (d) the Beneficiary's nursing needs cannot be met on a per-visit basis through Home Health Skilled Nursing services; and (e) there is no third party resource, as described in the *2004*

*Texas Medicaid Provider Procedures Manual*, section 1.5.3, financially responsible for the services.

4.10    The Agency or its Contractor will authorize Home Health Skilled Nursing services when: (a) the request is complete, as described in paragraph 4.7; (b) the requested services are nursing services as defined by the Texas Nursing Practice Act and its implementing regulations; (c) the explanation is sufficient to support that the requested services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition; (d) the Beneficiary's nursing needs can be met on a per-visit basis; and (e) there is no third party resource, as described in the *2004 Texas Medicaid Provider Procedures Manual*, section 1.5.3, financially responsible for the services.

4.11    The Nurse Reviewer may deny authorization for nursing services when: (a) the request is incomplete; (b) the information in the request is inaccurate or inconsistent as described in paragraph 4.7 or does not provide an explanation as to how the requested services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition; or (c) the requested services are not nursing services as defined by the Texas Nursing Practice Act and its implementing regulations.  The Nurse Reviewer may also deny authorization for Private Duty Nursing when the Beneficiary's nursing needs could be met on a per-visit basis through Home Health Skilled Nursing visits.

4.12    Only Nurse Reviewers acting within the scope of their license may make a preliminary determination that the requested nursing services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition.

4.13    Prior to denying or reducing nursing services on the bases described in paragraph 4.11, or prior to making a preliminary determination that the requested services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, the Agency or its Contractor will contact the nursing services Provider and/or the treating physician to determine whether additional information or clarification can be provided that would allow for the authorization of the requested nursing services.

4.14    When the Agency or its Contractor determines that the requested nursing services are not nursing services and that the documentation may support authorization of personal care services, the notice denying the nursing services will describe the basis for this determination, in accordance with paragraph 18 of the Partial Settlement Agreement effective April 19, 2002.  The notice will include template language briefly describing the Personal Care Services benefit and where and how to request prior authorization for Personal Care Services.  The template language to be used is as follows:

"The medical information received may support authorization of Personal Care Services. Personal Care Services are support services provided to Medicaid Beneficiaries under 21 years of age who require assistance with activities of daily living and health related functions because of a physical, cognitive, or behavioral limitation related to their disability or chronic health condition.  For more information and to find out how to

obtain Personal Care Services for a Medicaid Beneficiary under 21 years of age, you should contact [the appropriate agency]."

4.15    When the Agency or its Contractor determines that the services requested do not support a request for Private Duty Nursing services because the services could be provided on a per-visit basis through Home Health Skilled Nursing services, the notice denying the Private Duty Nursing services will describe the basis for this determination, in accordance with paragraph 18 of the Partial Settlement Agreement effective April 19, 2002.  The notice will include template language briefly describing the Home Health Skilled Nursing services benefit and where and how to request prior authorization for Home Health Skilled Nursing services.  The template language to be used is as follows:

"The medical information received may support authorization of Home Health Skilled Nursing services.  Home Health Skilled Nursing services are nursing services provided on a per-visit basis.  Home Health Skilled Nursing services may be provided to meet acute care needs or on an on going basis to meet chronic needs. For more information and to find out how to obtain Home Health Skilled Nursing services, you should contact [the appropriate agency]."

4.16    When the Nurse Reviewer makes a preliminary determination that the requested nursing services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, and additional information or clarification from the nursing services Provider and/or the treating physician does not change this preliminary determination, the Nurse Reviewer will forward the request and all documentation related to the request to the Contractor's Medical Director for review.  The Medical Director will determine whether the requested nursing services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition.

4.17    If the Medical Director determines that the requested nursing services correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, the Medical Director will authorize the services.  If, however, the Medical Director determines that requested nursing services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, the Medical Director will call and confer with the Beneficiary's treating physician prior to making a final determination.

4.18    If a request for nursing services is denied or reduced on the basis that requested services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, the notice to the Beneficiary of this determination will describe why the requested nursing services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition, as provided in paragraphs 18 and 19 of the Partial Settlement Agreement effective April 19, 2002.

4.19 When the Medical Director denies a request for nursing services and the Beneficiary requests a fair hearing, the Medical Director must attend the fair hearing and provide testimony describing why the requested services do not correct or ameliorate the Beneficiary's disability or physical or mental illness or condition.  42 C.F.R. § 431.242.

Despite agreeing to this new prior authorization process, Texas Medicaid has not amended its

rules to include the process. Texas Medicaid simply describes the prior authorization process in

its PDN Benefits and Limitations rule as follows:

> (3) Authorization of services.
>  (A) Authorization is required for payment of services.
>  (B) Only those services that are determined by HHSC or its designee to be medically necessary and appropriate will be reimbursed.
> (C) No authorization for payment of private duty nursing services may be issued for a single service period exceeding six months. Specific authorizations may be limited to a time period less than the established maximum based on the stability and predictability of the client.
> (D) The family will be notified in writing by HHSC or its designee of the approval, reduction, or denial of requested private duty nursing services.
> (E) The provider will be notified in writing by the HHSC or its designee of the approval, reduction, or denial of requested private duty nursing services.
>  (F) Authorization requests for private duty nursing services must include the following:
>  (i) current HHSC authorization form, completed by the primary physician and provider;
>  (ii) plan of care, recommended, signed and dated by the client's primary physician. The primary physician reviews and revises the plan of care with each authorization, or more frequently as the physician deems necessary; and
>  (iii) current HHSC form, THSteps-CCP Private Duty Nursing Services Addendum to Plan of Care.
>  (G) If inadequate or incomplete information is provided, the provider will be requested to furnish additional documentation to enable HHSC to make a decision on the request.
>  (H) For authorization of extensions beyond the initial authorization period or revisions to an existing authorization, the provider must submit requests in writing. Required documentation for extending or revising authorization includes:
>  (i) current HHSC authorization form;
>  (ii) plan of care, recommended, signed and dated by the client's primary physician; and
>  (iii) current HHSC form, THSteps-CCP Private Duty Nursing Services Addendum to Plan of  Care, signed and dated by the client's primary physician.
>  (I) During the authorization process, providers are required to deliver the requested services from the start of care date. Providers are responsible for a safe transition of services when the authorization decision is a denial or reduction in the private duty nursing services being delivered.

1 TAC § 363.311(b)(3).

This Texas Medicaid rule only describes the process for submitting a request for PDN and does not describe the process used by Texas Medicaid and its contractor when reviewing requests.[10]  Omitting the new review process from the rules leaves the impression that that no such new review process exists.

## B.      Durable Medical Equipment Policies

Similarly, Texas Medicaid was ordered by this Court to conform its medical benefit policies for Durable Medical Equipment and Supplies ("DME") to the terms of the Agreements. Specifically, Texas Medicaid was ordered,

> Beginning with the effective date of this Agreement and prior to the publication of the *2007 Texas Medicaid Provider Procedures Manual*, the Agency will review all medical benefit policies for DME to identify changes necessary to conform the policies to the terms and conditions of this Agreement, including, but not limited to, the medical necessity standard described in paragraph 3.1. . . .  All changes to DME policies necessary to conform to the terms and conditions of this Agreement will be included in the *2007 Texas Medicaid Provider Procedures Manual*.

Agreements, ¶ 8.2.

Despite the Court's Orders, Texas Medicaid has failed and refused to bring its medical benefit policies for DME into compliance with terms of the Agreements.

Texas Medicaid was also required by the Court's Orders "to authorize all requested medically necessary DME for Beneficiaries, as required by 42 U.S.C. § 1396d(r)(5)," to use the medical necessity standard in paragraph 3.1 of the Agreements ("correct or ameliorate"), and to "make available to Beneficiaries and Providers all DME criteria and a description of the prior authorization process for DME, including a description of the process for obtaining items of DME not specifically identified in any DME list," as required by 42 U.S.C. §1396a(a)(43)(A). Agreements, ¶¶ 2.1., 2.16.

---

[10] The TMPPM describes some but not all of the review process. TMPPM §43.4.13.5

Texas Medicaid has failed to comply with these portions of the Court's Orders by denying beneficiaries under the age of 21 all medically necessary DME, by failing to use the proper medical necessity standard, and by using unknown or unascertainable criteria in denying requests for medically necessary DME.  The evidence of Texas Medicaid's noncompliance with Court's Orders is set forth below.

**1.     Texas Medicaid's Policies Governing Requests for Manual Wheelchairs Do Not Conform to the Terms of the Agreements**

*a)*     **Failure to Use the Proper Medical Necessity Standard**

Texas Medicaid's Provider Procedures Manual allegedly sets forth the criteria used to consider requests for manual wheelchairs in section 24.5.26.5, which states that "[c]ustom manual wheelchairs may be considered for prior authorization for a client who meets criteria for a manual wheelchair, has a condition that requires customized seating, and cannot safely utilize a standard manual wheelchair."   Exhibit M (TMPPM 24.5.26.5).   The criteria for a manual wheelchair requires the provision of "significant medical information pertinent to mobility and requested equipment including intellectual, postural, physical, sensory (visual and auditory), and physical status," and must also address "trunk and head control, balance, arm and hand function, existence and severity of orthopedic deformities, as well as any recent changes in the client's physical and/or functional status, and any expected/potential surgeries that will improve or further limit mobility."  *Id.* (TMPPM 24.5.26.4).  For beneficiaries under the age of 21, criteria can also be found in policy 43.4.5.5 ("Mobility Aids")(attached as Exhibit N), which states that the requested "equipment must be medically necessary," and that the "client's mobility status would be compromised without the requested equipment."  *Id.*  Neither the policy setting forth the criteria for manual wheelchairs nor the mobility aids policy uses the medical necessity standard required by the Agreements, that is, whether the requested wheelchair (DME) "is

required to correct or ameliorate [the beneficiary's] disabilities or physical and mental illnesses or conditions."  Agreements, ¶ 3.1, Exhibits A & B.  Instead, Texas Medicaid is using unwritten or unascertainable criteria to deny requests for medically necessary manual wheelchairs.

>   *b)*     **Use of Unwritten or Unascertainable Criteria to Deny Requests for Medically Necessary Manual Wheelchairs**

Texas Medicaid, by failing to use to medical necessity standard required by the Court's Orders, and by using unwritten, unascertainable, or unknown criteria, is denying beneficiaries medically necessary manual wheelchairs.  For example, Texas Medicaid denied beneficiary S.'s request for a medically necessary lightweight manual wheelchair on the impermissible basis that he could only self propel a manual wheelchair 50 yards, which, according to Texas Medicaid, was insufficient to "facilitate independent mobility outside of the home."[11]  This "distance criterion" is not in compliance with the medical necessity standard required by the Agreements, and is not found in any known or ascertainable policy.  Texas Medicaid apparently just made it up.  The Agreements, however, righty prohibit such action by requiring Texas Medicaid to use the "correct or ameliorate" standard and to "make available to Beneficiaries and Providers all DME criteria and a description of the prior authorization process for DME . . . ."  Agreements, ¶¶ 3.1, 2.16.

Another beneficiary, C., was denied a medically necessary manual wheelchair because Texas Medicaid decided he could not self propel his manual wheelchair, which he been using for many months (as a loaner), "for functional distances."  See denial notice dated October 9, 2008,

---

[11] See denial notice dated April 28, 2009, attached as part of Exhibit Q.  Exhibit Q also contains a letter to Texas Medicaid from Plaintiffs' counsel that further set out the impropriety of Texas Medicaid's action, and informed Texas Medicaid that it was failing to comply with the Agreements (specifically ¶¶ 2.1, 2.12, 2.16, and 3.1)(see fn 1 and the last paragraph of page four of letter dated May 11, 2009).

attached as Exhibit O.   This "functional distances" criterion appears nowhere in the Texas Medicaid's manual wheelchair or mobility aids policies (see Exhibit M).[12]

Another beneficiary, B., was denied a medically necessary manual wheelchair because of Texas Medicaid's use of unwritten, unascertainable, and impermissible medical necessity criteria.   In the notices Texas Medicaid provided to B.s' wheelchair provider, Texas Medicaid asks "how far" B. "is able to self-propel,"[13] (the distance criterion again), and also "[h]ow much can the client see?,"[14] and "[d]oes the client crawl?"[15]   None of these criteria are found in Texas Medicaid's wheelchair or mobility aids policies, and, even if they were, they do not conform to the "correct or ameliorate" medical necessity standard required by the Agreements.

Based on the above, and the plain language of the policies, Texas Medicaid is not in compliance with the Court's Orders.

### 2.    Texas Medicaid's Policies Governing Requests for Medically Necessary Gait Trainers, Standers, and Parapodiums Do Not Comply with the Court's Orders

The 2009 Texas Medicaid Provider Procedures Manual continues to improperly limit the authorization of standers and gait trainers (items of DME) for beneficiaries under the age of 21. See TMPPM 24.5.26.13, 24.5.26.14, attached as Exhibit M.   This limitation on medically necessary DME violates the Court's Orders requiring that Texas Medicaid authorize all medically necessary DME, and that it not apply or establish an absolute cap on the amount of DME available beneficiaries.   Agreements, ¶¶ 2.1, 2.6, Exhibits A & B.

---

[12] Plaintiffs' counsel represented C. at his fair hearing, and can attest that Texas Medicaid's representative stated she did not know what a "functional distance" was, and she confirmed that to her knowledge "function distance" was not written in any Texas Medicaid policy.
[13] See notice dated January 13, 2009, attached as Exhibit P.
[14] See notice dated January 9, 2009, Exhibit P.
[15] Id.

Texas Medicaid's policy for standers impermissibly and unequivocally states that "[s]tanders, gait trainers, and parapodiums will not be authorized for a client within one year of each other."  TMPPM 24.5.26.13, Exhibit M.  Texas Medicaid's policy for gait trainers reiterates this limitation: "[s]tanders, gait trainers, and parapodiums/standing frames/braces/vertical standers that are covered through THSteps-CCP [EPSDT] will not be authorized for a client within one year of each other."  TMPPM 24.5.26.14, Exhibit M.  In other words, Texas Medicaid will not approve a gait trainer for a beneficiary, for example, *even if it is medically needed*, if that beneficiary has been authorized a stander or parapodium within the prior year.  This type of limitation on medically necessary DME was expressly prohibited by the Court's Orders.

Standers, gait trainers, and parapodiums are different types of durable medical equipment, and the Court's Orders state that the only medical necessity standard to be used when authorizing DME is whether the requested DME "is required to correct or ameliorate disabilities or physical and mental illnesses or conditions."  Agreements, ¶ 3.1.  Pursuant to the Court's Orders, if the requested DME meets this medical necessity standard, "Texas Medicaid will authorize all requested medically necessary DME for Beneficiaries, as required by 42 U.S.C. § 1396d(r)(5)."  See Agreements, ¶ 2.1.

In addition, the type of arbitrary limitation found in Texas Medicaid's stander and gait trainer policies was expressly and strictly prohibited by the Court: paragraph 2.6 of the Agreements mandate that Texas Medicaid "will not establish or apply an absolute cap on the amount of DME available to Beneficiaries."  Texas Medicaid's limitation or cap on standers and gait trainers obviously fails to comply with this provision, and is therefore not in compliance with the Court's Orders.

Plaintiffs have repeatedly complained to Texas Medicaid that its stander and gait trainer policies are in violation of the Court's Orders.  For example, in a letter dated May 3, 2007, Plaintiffs complained that, "Notably, the DME policy continues to exclude provision of standers to beneficiaries who have gait trainers, despite the different needs that these pieces of equipment meet."[16]  On May 25, 2007, Plaintiffs again complained about Texas Medicaid's stander and gait trainer policies; Plaintiffs notified Texas Medicaid it had unlawfully denied a beneficiary's request for a gait trainer on the impermissible basis that the beneficiary had received a stander within the same year.[17]  In their letter, Plaintiffs informed Texas Medicaid that, "As you know, this 'criteria,' i.e., *limitation*, plainly violates federal law and the Second Agreement, and Plaintiffs have complained of this particular limitation for at least the last six years."[18]

In January 2007, Texas Medicaid impermissibly denied a beneficiary a medically necessary gait trainer stating that, "The Texas Medicaid Provider Procedures Manual states that the client cannot receive authorization for these items within one year of each other."[19]

And, as recently as April 2009, Texas Medicaid unlawfully denied a beneficiary a medically necessary gait trainer because he had been issued a stander in 2008.  Texas Medicaid's denial notice specifically stated that, "According to the 2009 Texas Medicaid Provider Procedures Manual 24.4.27.15 Gait Trainers: Standers, gait trainers, parapodiums/standing

---

[16] Plaintiffs' Letter to HHSC counsel dated May 3, 2007, attached as Exhibit R.

[17] Plaintiffs' Letter to Defendants dated May 25, 2007, attached as Exhibit S.

[18] *Id.*

[19] See redacted denial notice, attached as Exhibit T.  In this beneficiary's case, his doctor ordered the gait trainer and attested to its medical necessity, as did the beneficiary's physical therapist, who wrote a letter to Texas Medicaid stating that, "The stander does not substitute his need for supported gait training and muscle reeducation."  Despite confirmation of medical need from the beneficiary's treating professionals, Texas Medicaid denied the gait trainer simply because a stander had been authorized within the previous twelve months.

frames/braces/vertical standers that are covered through THSteps-CCp [EPSDT] will not be prior authorized for a client within one year of each other."[20]

## IV. NOTICE

The Agreements require Plaintiffs to provide notice of any allegations of noncompliance thirty days prior to seeking enforcement. Agreements, ¶16.1. As the evidence attached to this motion establish, see Exhibits E, G, Q, R, and S, Plaintiffs provided notice to Defendants in accordance with the Agreements.

## V. CONCLUSION

For the reasons set forth above, and because Defendants have not complied with the Orders of this Court, Plaintiffs request that the Court grant this motion, find Defendants in civil contempt of the Court's Orders, and enter remedial orders as necessary to enforce its Orders dated June 23, 2005 and February 22, 2008.

---

[20] See redacted denial notice, attached as Exhibit U. In this beneficiary's case, his doctor ordered the gait trainer and attested to its medical necessity, and his physical therapist also provided letters and documentation of medical need. As with the beneficiary, despite confirmation of medical need from this beneficiary's treating professionals, Texas Medicaid denied his request for a gait trainer simply because a stander had been authorized within the previous twelve months.

Respectfully submitted,


_____/s/ Peter Hofer_____

PETER HOFER
Texas Bar No. 09777275
ADVOCACY, INC.
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757
(512) 454-4816
(512) 454-3999 Fax

MARYANN OVERATH
Texas Bar No. 00786851
TEXAS LEGAL SERVICES CENTER
Alliance for Healthcare Representation
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757
(512) 587.1614
(512) 597.6143 Fax

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF CONFERENCE

I hereby certify that on June 30, 2009, I conferred with counsel for Defendants, Nancy K. Juren, who stated that Defendants oppose this motion.

/s/ Peter Hofer
Peter Hofer

## CERTIFICATE OF SERVICE

I certify that on July 1, 2009, a true and correct copy of the foregoing document was sent, via Courier, to the person listed below in accordance with the Local Rules for the U.S. District Court for the Eastern District of Texas:

Nancy K. Juren
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Attorney for Defendants

/s/ Peter Hofer
Peter Hofer